**Cozen O'CONNOR, Appellant**

v.

**CITY OF PHILADELPHIA BOARD OF ETHICS and City of Philadelphia and The Honorable Robert A. Brady and Friends of Bob Brady.**

Commonwealth Court of Pennsylvania.

Argued May 14, 2013.

Decided June 18, 2013.

Stephen A. Cozen, Philadelphia, for appellant.

Cheryl A. Krause and Elisa T. Wiygul, Philadelphia, for appellee City of Philadelphia Board of Ethics.

BEFORE: LEADBETTER, Judge, BROBSON, Judge, and FRIEDMAN, Senior Judge.

OPINION BY Judge BROBSON.

█ In this appeal, Appellant Cozen O'Connor (Firm) contends that the Court of Common Pleas of Philadelphia County (trial court) erred when it determined that the campaign finance provisions of Philadelphia Code Chapter 20–1000 (Philadelphia Campaign Finance Law) limited the manner by which the Firm could forgive $448,468.09 in legal debt incurred by the Friends of Bob Brady (Committee) in defending a ballot challenge to the candidacy of U.S. Congressman Bob Brady in the 2007 Philadelphia Democratic mayoral primary. The Firm also argues that the trial court erred when it refused to also consider the question of whether the Committee could fundraise to retire the legal debt without regard to the contribution limits of the Philadelphia Campaign Finance Law. For the reasons set forth below, we affirm the trial court's decision to deny the Firm's request for judgment on the pleadings and to grant, in part, judgment on the pleadings in favor of the City of Philadelphia Board of Ethics (Ethics Board).[1]

## BACKGROUND

In 2007, Congressman Brady was one of several candidates in the Philadelphia mayoral primary for the Democratic nomination. After formally announcing his candidacy, he formed the Committee to handle his campaign contributions and expenditures. (Reproduced Record (R.R.) at 42a.) Thomas Knox (Knox), another candidate in the 2007 Democratic mayoral primary, filed a legal challenge to Congressman Brady's candidacy, contending that Congressman Brady filed a legally deficient Statement of Financial Interests with the Philadelphia Board of Elections ("Ballot Challenge"). The Committee engaged

---

1. "This Court's scope of review of a trial court's decision to grant or deny a motion for judgment on the pleadings is limited to determining whether the trial court committed an error of law or abused its discretion." *Dep't of Pub. Welfare v. Lubrizol Corp. Emp. Benefits Plan,* 737 A.2d 862, 865 n. 4 (Pa.Cmwlth. 1999). "Our standard of review of an order granting or denying a motion for judgment on the pleadings is plenary." *Tobias v. Halifax Twp.,* 28 A.3d 223, 226 n. 4 (Pa.Cmwlth. 2011), *appeal denied,* 616 Pa. 640, 47 A.3d 849 (2012).

the Firm to defend the challenge. The Firm did so successfully before the trial court and through appeal to this Court, but at a cost to the Committee of $448,468.09. Neither Knox nor Congressman Brady secured the Democratic nomination that year.

On July 27, 2007, and after the certification of the primary election results, the Firm, on behalf of the Committee, sought an advisory opinion from the Ethics Board as to whether the receipt of funds by the Committee would be subject to the contribution limitations set forth in Section 20–1002(1) and (2) of the Philadelphia Campaign Finance Law[2] if the Committee received the funds after the election and the receipts were intended for the purpose of retiring the pre-election legal debt incurred by the Committee. (*Id.* at 79a.) The Ethics Board issued its advisory opinion on September 14, 2007, indicating that such payments would be subject to the contribution limits provided in the Philadelphia Campaign Finance Law. (*Id.* at 97a.)

On March 6, 2008, the Firm, as the named plaintiff, commenced a declaratory judgment action in the trial court, seeking a declaration that the legal fee debt incurred by the Committee to defend the Ballot Challenge was not an "expenditure" and that any post-election receipts intended to satisfy that pre-election debt were not "contributions" under the Philadelphia Campaign Finance Law.[3] (*Id.* at 58a–59a.) On April 14, 2008, the Ethics Board filed preliminary objections, arguing, *inter alia,* that the Firm lacked standing to pursue the action. (*Id.* at 110a–11a.) By order dated June 10, 2008, the trial court sustained the Ethics Board's preliminary objections and dismissed the Firm's complaint with prejudice. (*Id.* at 204a–05a.)

On July 15, 2008, the Firm appealed the trial court's order to this Court. We affirmed, opining:

> At the core of the Firm's argument is that the Board's interpretation of the Philadelphia Campaign Finance Law frustrates the Committee's efforts to raise funds to retire campaign debt, particularly its legal fees. The question then simply becomes whether a creditor of a campaign committee has the direct, substantial interest necessary for standing.

*Cozen O'Connor v. City of Phila. Bd. of Ethics,* 970 A.2d 504, 507 (Pa.Cmwlth. 2009), *rev'd,* 608 Pa. 570, 13 A.3d 464

---

**2.** At the time of Congressman Brady's candidacy, Section 20–1002(1) and (2) of the Philadelphia Campaign Finance Law limited the campaign contributions that may be made to a candidate for City elective office to $2,500 per calendar year, for an individual, and $10,000 per calendar year, for business entities and political committees. Under Section 20–1002(9) (formerly Section 20–1002(6)) of the Philadelphia Campaign Finance Law, if a candidate for City elective office contributes $250,000 or more to his campaign, the contribution caps double for all candidates for that City elective office. Because Knox hit this threshold with respect to his candidacy (R.R. at 48a), the contribution limits for Congressman Brady and the other candidates in the 2007 Democratic mayoral primary were $5,000 per individual and $20,000 per business entity and political committee.

**3.** At the time this matter arose, the definition of "expenditure" was codified at Section 20–1001(8) of the Philadelphia Campaign Finance Law, and the definition of "contribution" was codified at Section 20–1001(4) of the Philadelphia Campaign Finance Law. Currently, the definition of "expenditure" is located at Section 20–1001(11) of the Philadelphia Campaign Finance Law, and the definition of "contribution" is located at Section 20–1001(6) of the Philadelphia Campaign Finance Law. Notwithstanding their renumbering, the definitions of these terms remained unchanged. Thus, for ease of reference, we cite to the current sections of the Philadelphia Campaign Finance Law.

(2011). In holding that the Firm lacked standing, we concluded that "the Firm is not aggrieved because it does not have a direct, immediate and substantial interest in the outcome of the appeal," because the Philadelphia Campaign Finance Law governs contribution amounts received by candidates and their committees and "does not mention unpaid creditors.... [T]he Firm's claim is a collateral concern that does not satisfy the traditional standing requirement." *Id.*

The Pennsylvania Supreme Court granted allocatur on the following issue:

Did [the Firm] have standing to obtain a declaratory judgment where [the Firm] alleged in its complaint that it intended to forgive the outstanding debt of the ... Committee at one time and *in toto,* thereby exposing itself to potential civil penalties and other sanctions under [the Philadelphia Campaign Finance Law]?

*Cozen O'Connor v. City of Phila. Bd. of Ethics,* 605 Pa. 129, 987 A.2d 715 (2009) (order granting allocatur in part). The Supreme Court denied allocatur "as to all remaining issues." *Id.*

Before the Supreme Court, the Firm argued that this Court "improperly viewed its claim as one based solely on its desire to determine whether, and how, the Committee could raise funds post-election so that it could be paid," but that it also sought clarification of the Philadelphia Campaign Finance Law to determine whether "it could, in its own right, forgive the debt at issue." *Cozen O'Connor v. City of Phila. Bd. of Ethics,* 608 Pa. 570, 575–76, 13 A.3d 464, 467 (2011) (*Cozen I*). After determining that "the Firm sufficiently pled as a basis for relief in its declaratory judgment action its own inability to forgive the total outstanding debt without potentially violating" the Philadelphia Campaign Finance Law as interpreted by the Ethics Board, the Supreme Court concluded "that the Firm possesses standing in this regard in that it has a substantial, direct, and immediate interest in knowing whether it may, in its own right, forgive the total outstanding debt owed to it by the Committee without" violating the Philadelphia Campaign Finance Law as interpreted by the Ethics Board. *Id.* at 583, 13 A.3d at 472. The Supreme Court, therefore, reversed this Court's decision and remanded the matter to this Court for further proceedings. By order dated May 16, 2011, this Court remanded the matter to the trial court upon consideration of the Firm's motion to remand. (R.R. at 224a.)

Now back in the trial court, the Ethics Board filed renewed preliminary objections, which the trial court struck by order dated October 18, 2011. (*Id.* at 508a.) The Ethics Board then filed an answer with new matter to the complaint, arguing, *inter alia,* that the matter was moot because the City of Philadelphia (City) had amended the Philadelphia Campaign Finance Law and accompanying regulations in 2010 to address the very issues raised by the Firm in its declaratory judgment action. (*Id.* at 548a–50a.) Both parties subsequently moved for judgment on the pleadings. (*Id.* at 631a–61a, 668a–74a.)

After hearing oral argument on the matter, the trial court issued two orders, the first denying the Firm's motion for judgment on the pleadings and the second granting the Ethics Board's motion for judgment on the pleadings in part. (*Id.* at 761 a–66a.) In so doing, the trial court determined that the Philadelphia Campaign Finance Law as it existed prior to the 2010 amendments was controlling, as the amendments were not retroactive. (*Id.* at 761a, 764a.) The trial court also concluded that the legal fees incurred by the Committee were regulated "expendi-

tures" under the Philadelphia Campaign Finance Law, because they were incurred for the purpose of influencing the outcome of the 2007 Democratic mayoral primary election. (*Id.* at 762a, 764a.) Furthermore, the trial court determined that the Firm's post-election forgiveness of the debt at one time and *in toto* would constitute a regulated "contribution" and would, therefore, be subject to the contribution limits set forth in the Philadelphia Campaign Finance Law. (*Id.* at 762a, 765a.) The trial court reasoned that the legal fees were incurred by the Committee for the purpose of ensuring that Congressman Brady could remain on the ballot in the 2007 Democratic mayoral primary, which, in turn, influenced the outcome of the election. (*Id.*) The trial court further explained that the Firm's forgiveness of the pre-election legal fee debt relates back to the expenditures that influenced the election. (*Id.*)

Finally, the trial court declined to rule on the question of how the Philadelphia Campaign Finance Law would impact the Committee's ability to engage in fundraising to pay the legal fee debt owed to the Firm. (*Id.* at 762a–63a, 766a.) The trial court reasoned that the issue was not properly before it, as the Pennsylvania Supreme Court declined allocatur to examine the issue, which left final this Court's holding that the Firm lacked standing to seek a legal determination of that question. (*Id.*)

## DISCUSSION

### A. Scope of Pennsylvania Supreme Court Remand

■ We first address the Firm's contention that the trial court erred in declining to render a decision regarding whether the Committee could engage in fundraising to pay off the legal fee debt without being subject to the contribution limitations under the Philadelphia Campaign Finance Law. The Firm[4] argues that when the Supreme Court in *Cozen I* reversed this Court on the issue of standing, it held that the Firm could proceed on all questions raised in its complaint for declaratory relief, including the question of whether the Committee could raise unlimited funds to retire the legal fee debt.

The Firm couches the original claims in the complaint as "seeking a declaration as to the legally-allowable means to retire the legal fees debt at issue." (Firm Br. at 33.) It contends that although the Pennsylvania Supreme Court accepted for review only the issue of standing in reference to the implications to the Firm under the Philadelphia Campaign Finance Law if it chose to forgive the debt owed by the Committee, once the Supreme Court held that such an interest was sufficient to confer standing, the Firm could pursue every question set forth in its complaint for declaratory relief directed to legally-allowable methods to retire the debt. We must disagree with the Firm's interpretation of the Supreme Court's decision in *Cozen I*.

As recounted above, when this matter was last before us, we noted that the core of the Firm's dispute in its complaint for declaratory relief was its contention that the Ethics "Board's interpretation of the Philadelphia Campaign Finance Law frustrates *the Committee's* efforts to raise funds to retire campaign debt, particularly [the Firm's] legal fees." *Cozen*, 970 A.2d at 507 (emphasis added). The Committee did not bring the declaratory judgment action. The question of standing, then,

4. The City did not file a brief in this matter. Also, neither Congressman Brady nor the Committee filed a brief in this matter, although they informed the Court that they adopt and join the positions advanced by the Firm.

turned on what interest the Firm had in determining *the Committee's* avenues for retiring the legal fee debt to the Firm. As explained by the Supreme Court, we held that the Firm, "as a mere campaign creditor, had no direct or immediate interest in how, or if, *the Committee could legally raise funds to pay off its debt to the Firm." Cozen I*, 608 Pa. at 575, 13 A.3d at 467 (emphasis added). We, therefore, upheld the trial court's ruling, dismissing the complaint for lack of standing.

In granting allocatur, the Pennsylvania Supreme Court clearly expressed an intent to narrow the question on review. This is evident throughout the Supreme Court's opinion, starting with the first paragraph:

> We granted allocatur in this case to determine whether [the Firm] … has standing to bring a declaratory judgment action … *to determine whether it may forgive, at one time and in toto, the* Committee's outstanding debt … to the Firm without violating the $10,000 per year contribution limitation set forth in [the Philadelphia Campaign Finance Law].

*Id.* at 572, 13 A.3d at 465 (emphasis added). Later, the Supreme Court restated the purposes for its review of this Court's decision, confining the question to the ability of the Firm to seek *certain* declaratory relief in this matter:

> We granted the Firm's appeal limited to the issue of whether it had standing to bring a declaratory judgment action to determine whether it could forgive the outstanding debt, owed to it by the Committee, at one time and in *toto* without violating Philadelphia's campaign contribution limitations. …

*Id.* at 576, 13 A.3d at 467. Nowhere in the Supreme Court's opinion does it speak to the ability of the Firm to seek declaratory relief on the question of whether *the Committee* may conduct unrestricted post-election fundraising to retire the debt owed to the Firm.

Though we perceived the focus of the Firm's complaint for declaratory relief as seeking legal rulings on how the Philadelphia Campaign Finance Law limits *the Committee's* avenues to retire the legal fee debt, the Pennsylvania Supreme Court found and narrowed its review to a second purpose:

> Although the Firm did not set forth the exact phrase "that it intends to forgive the debt at one time and *in toto*," such is certainly contemplated by the above cited paragraphs. In those passages, the Firm references both the Committee's inability to raise funds to pay off the debt, given the Ethics Board's interpretation, and its own inability to forgive the debt based on such interpretation. *Clearly, the Firm sought a declaratory judgment in order to clarify whether either of these two events could take place. …*

*Id.* at 582–83, 13 A.3d at 471–72 (emphasis added). Upon recognizing the dual clarifying purposes for the Firm's lawsuit, the Supreme Court held that the Firm had standing in its own right to seek declaratory relief with respect to the question of how the law directly affected the Firm:

> Having concluded that the Firm sufficiently pled *as a basis for relief in its declaratory judgment action its own inability to forgive the total outstanding debt without potentially violating the Ethics Board's interpretation of the campaign contribution limitations of the Code*, we, likewise, conclude that the Firm possesses standing *in this regard. …*

*Id.* at 583, 13 A.3d at 472 (emphasis added). But as to this Court's and the trial court's decisions that the Firm lacked standing as a creditor to seek declaratory

relief as to what the Committee may do to retire the debt, the Pennsylvania Supreme Court, noting that it declined to grant *allocatur* on that question, held that the decision was "final and binding on the parties." *Id.* at 581, 13 A.3d at 471.

Based on these passages, we do not agree with the Firm's central premise that once the Supreme Court found that the Firm had standing to seek declaratory relief as to the proper application of the Philadelphia Campaign Finance Law to the Firm's activities, the Firm may proceed in this action to also seek declaratory relief on the proper application of the Philadelphia Campaign Finance Law to the activities of the Committee. Indeed, this Court held that the Firm lacked standing to seek such relief. Because the Supreme Court limited the issue for review to whether the Firm has standing to bring a declaratory judgment action to determine whether it may forgive at one time and *in*

*toto* its account receivable from the Committee, our ruling that the Firm may not pursue a declaratory judgment action to determine the lawfulness of the Committee's actions (*i.e.*, post-election fundraising without campaign finance limits) stands. We thus affirm the trial court's decision to limit its review to the issue accepted for review by the Pennsylvania Supreme Court and to refuse to address any question related to how the Philadelphia Campaign Finance Law would impact the Committee's post-election activities.

## B. Post–Election Forgiveness of Legal Fees for Ballot Challenge

We now turn to the Firm's contention that the trial court erred in concluding that the contribution limits in the Philadelphia Campaign Finance Law limit the manner by which the Firm may forgive the legal fee debt of the Committee.[5] Specifi-

---

5. In its brief to this Court, the Ethics Board again puts forth its mootness argument and contends, alternatively, that the matter is not ripe for judicial review, because the Firm has not attempted to seek relief before the Ethics Board under the law as it now stands. In its orders dated July 18, 2012, however, the trial court determined that the campaign finance provisions in effect in 2007 are controlling, as the later amendments to the Philadelphia Campaign Finance Law were not retroactive. (R.R. at 761a, 764a.) In response, the Board argues that this Court "need not worry" that applying the current law would constitute a retrospective application of the law, as the amendments do not operate retroactively simply because the circumstances from which this matter arose existed before the amendments' enactment and the Firm has not yet attempted to forgive the debt. (Ethics Board Br. at 15 n. 11.) Whatever remedies are available to the Firm or the Committee under the current Philadelphia Campaign Finance Law do not render moot the issue for declaratory relief addressed by the trial court and now on appeal to this Court. We, therefore, reject the Ethics Board's mootness and ripeness arguments.

We note, however, that notwithstanding our disposition of this matter, it appears that the Firm has two avenues by which it may seek to forgive the debt at issue. First, under the current version of the Philadelphia Campaign Finance Law, the Firm can forgive the debt incrementally over time without violating the campaign contribution limitations. *See* Section 20–1001(14) of the Philadelphia Campaign Finance Law (defining "post-candidacy contribution," in part, as "forgiveness of debts ... received by a former candidate or his/her agent for use in retiring debt that was incurred to influence the outcome of a covered election"); Section 20–1002(5) (providing that business entities and political committees can make post-candidacy contributions up to $10,600 "[d]uring the interval between such general election (or primary election, with respect to candidates who were not nominated) and the end of the calendar year in which the general election occurred, and in each calendar year thereafter"). Second, upon application to the Ethics Board, the Firm may forgive the entire debt owed to it by the Committee at one time and *in toto*, without regard to the campaign contribution limitations, so long as the Firm meets the

cally, the Firm argues that legal fees incurred by the Committee to fend off a ballot challenge were not incurred *"for the purpose of influencing* the outcome of a covered election," because a candidate does not incur the fees with the intent to persuade the electorate to vote for one candidate over another (*i.e.*, "electioneering"). Because they were not incurred for *such purpose,* the incurred debt cannot be an "expenditure" and thus any forgiveness of that debt cannot be a "contribution." To hold otherwise, the Firm contends, would allow regulation of any spending that has any effect on an election, regardless of whether that effect is intentional, incidental, or wholly unanticipated. The Firm contends that, as stated by the trial court, such a result would be "fundamentally unfair to the candidate, their counsel and the citizenry." (R.R. at 893a n. 2.) Finally, the Firm argues that later amendments to the Philadelphia Campaign Finance Law illustrate that legal fee debt was not intended to be covered by the definition of "expenditure."

█ When interpreting a local law, this Court is guided by the Statutory Construction Act of 1972, 1 Pa.C.S. §§ 1501–1991, which provides that "[t]he object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly." 1 Pa. C.S. § 1921(a); *see Council of Middletown Twp. v. Benham,* 514 Pa. 176, 185, 523 A.2d 311, 315 (1987). "The clearest indication of legislative intent is generally the plain language of a statute." *Walker v. Eleby,* 577 Pa. 104, 123, 842 A.2d 389, 400 (2004). "When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." 1 Pa.C.S. § 1921(b). Only "[w]hen the words of the statute are not explicit" may this Court

resort to statutory construction. 1 Pa.C.S. § 1921(c). "A statute is ambiguous or unclear if its language is subject to two or more reasonable interpretations." *Bethenergy Mines Inc. v. Dep't of Envtl. Prot.,* 676 A.2d 711, 715 (Pa.Cmwlth.); *appeal denied,* 546 Pa. 668, 685 A.2d 547 (1996). Moreover, "[e]very statute shall be construed, if possible, to give effect to all its provisions." 1 Pa.C.S. § 1921(a). It is presumed "[t]hat the General Assembly intends the entire statute to be effective and certain." 1 Pa.C.S. § 1922(2). Thus, no provision of a statute shall be "reduced to mere surplusage." *Walker,* 577 Pa. at 123, 842 A.2d at 400. Finally, it is presumed "[t]hat the General Assembly does not intend a result that is absurd, impossible of execution or unreasonable." 1 Pa. C.S. § 1922(1).

█ As noted above, the legal issue before the Court is whether the Philadelphia Campaign Finance Law contribution limits would apply should the Firm choose to forgive a pre-election legal fee debt of the Committee. Notwithstanding the Firm's arguments, resolution of this issue turns predominantly on the question of whether the post-election forgiveness of pre-election campaign debt would be a "contribution" under the Philadelphia Campaign Finance Law, and not on whether the debt incurred was an "expenditure" of the Committee. In our analysis, however, it may be helpful to classify what the debt is at the outset.

The term "expenditure" is defined under Section 20–1001(11) of the Philadelphia Campaign Finance Law only as "[t]he payment, distribution, loan or advancement of money or any valuable thing by a candidate, political committee or other person for the purpose of influencing the outcome

criteria listed in the Ethics Board's Regula-          tion No. 1.

of a covered election."[6] A campaign committee's *unpaid* debt, however, is not an expenditure, because it does not represent the campaign committee's payment, distribution, loan, or advancement of money or other valuable thing. Under the Pennsylvania Election Code, Act of June 3, 1937, P.L. 1333, *as amended,* 25 P.S. §§ 2600–3591 (Election Code), candidates report unpaid debts separately from expenditures. Section 1626(b)(4) (relating to reporting of expenditures), (5) (relating to reporting of unpaid debts and liabilities) of the Election Code, 25 P.S. § 3246(b)(4), (5). For this reason and this reason alone, we agree with the Firm that the Committee's debt to the Firm is not an expenditure.

This leads us to the question of whether a creditor's post-election forgiveness of a campaign committee's pre-election legal fee debt, which the committee incurred to fend off a ballot challenge, is a "contribution" subject to regulation under the Philadelphia Campaign Finance Law. Section 20–1001(6) of the Philadelphia Campaign Finance Law defines "contribution" as follows: "Money, gifts, forgiveness of debts, loans, or things having a monetary value incurred or received by a candidate or his/her agent for use in advocating or influencing the election of the candidate." By contrast, the definition of "contribution" in the Election Code is more robust:

> The word **"contribution"** shall mean any payment, gift, subscription, assessment, contract, payment for services, dues, loan, forbearance, advance or deposit of money or any valuable thing, to a candidate or political committee made for the purpose of influencing any election in this Commonwealth *or for paying debts incurred by or for a candidate or committee before or after any election.* "Contribution" shall also include the purchase of tickets for events such as dinners, luncheons, rallies and all other fund-raising events; the granting of discounts or rebates not available to the general public; or the granting of discounts or rebates by television and radio stations and newspapers not extended

**6.** Contrast the definition in the Philadelphia Campaign Finance Law with the definition of "expenditure" in Article XVI of the Pennsylvania Election Code, Act of June 3, 1937, P.L. 1333, *as amended,* added by the Act of October 4, 1978, P.L. 893, 25 P.S. §§ 3241–3260b (Election Code). Section 1621(d) of the Election Code defines "expenditure" to include:

> *(1) the payment, distribution, loan or advancement of money or any valuable thing by a candidate, political committee or other person for the purpose of influencing the outcome of an election;*
>
> (2) the payment, distribution, loan, advance or transfer of money or other valuable thing between or among political committees;
>
> (3) the providing of a service or other valuable thing for the purpose of influencing the outcome of a nomination or election of any person to any public office to be voted for in this Commonwealth; or
>
> (4) the payment or providing of money or other valuable thing by any person other

than a candidate or political committee, to compensate any person for services rendered to a candidate or political committee. 25 P.S. § 3241(d) (emphasis added). When it enacted the Section 20–1001 definition of "expenditure" in the Philadelphia Campaign Finance Law, the City evidenced an intent to regulate locally only the first of the four classes of expenditures regulated statewide by the Election Code. We note here that the Philadelphia Campaign Finance Law is not a substitute for the requirements of the Election Code. The Election Code applies to all candidates for public office, with the exception of those seeking the office of judge of elections or inspector of elections, in this Commonwealth, including those running for City elective office. *See id.* § 3241(a) (definition of "candidate"). The Philadelphia Campaign Finance Law merely places additional regulatory requirements on certain covered elections in the City. *See Nutter v. Dougherty,* 595 Pa. 340, 938 A.2d 401 (2007).

on an equal basis to all candidates for the same office; and any payments provided for the benefit of any candidate, including any payments for the services of any person serving as an agent of a candidate or committee by a person other than the candidate or committee or a person whose expenditures the candidate or committee must report under this act. The word "contribution" includes any receipt or use of anything of value received by a political committee from another political committee and also includes any return on investments by a political committee.

Section 1621(b) of the Election Code, 25 P.S. § 3241(b) (second emphasis added). The Firm seizes on the significant differences between the definitions. Although the City adopted nearly verbatim a portion of the Election Code definition of "expenditure," it chose to depart entirely from the Election Code's definition of "contribution." Specifically, the Firm points out, although the Election Code definition expressly encompasses payments made "for paying debts ... before or after any election," the City chose not to include the same language in its definition. This, the Firm insists, means that the City did not intend to regulate post-election debt liquidation activities.

The Firm also directs the Court to the 2010 amendments to the Philadelphia Campaign Finance Law. In those amendments, the City left the definition of "contribution" unchanged, but added a new term, "post-candidacy contribution," which is defined as follows:

Money, gifts, forgiveness of debts, loans, or things having a monetary value, received by a former candidate or his/her agent for use in retiring debt that was incurred to influence the outcome of a covered election, or for the purpose of defraying the cost of transition or inauguration of a candidate elected to City elective office.

Section 20–1001(14) of the Philadelphia Campaign Finance Law (added June 16, 2010). The 2010 amendments capped post-election contributions made between the end of a primary election and the calendar year, and in each calendar year thereafter, for an unsuccessful candidate at $2,600 per individual and $10,600 per political committee or business entity. Section 20–1002(4), (5). Citing precedent from the Pennsylvania Superior Court,[7] the Firm argues that these amendments must be interpreted as a recognition by the City that the law in existence at the time of the 2007 Democratic mayoral primary did not regulate post-election contributions and that the amendment was necessary to extend the reach of the law to such post-election activities going forward.

To bolster its position, the Firm cites to an excerpt from the Final Report and Recommendations of the Mayor's Task Force on Ethics and Campaign Finance Reform (Task Force), dated December 10, 2009. There, the Task Force addresses post-election contributions as follows:

It is not uncommon after a campaign has ended for candidates to: (i) maintain active campaign committees, (ii) receive and expend funds, and (iii) continue to fundraise to retire debt incurred during the course of the campaign. *However, post-campaign fundraising and expenditures do not appear to be explicitly addressed in Philadelphia's campaign finance law, despite the fact that the same concerns that campaign contributions not infect City governance apply to post-campaign contributions as well.*

---

**7.** *Midvale Co. v. Unemployment Comp. Bd. of Review,* 165 Pa.Super. 359, 67 A.2d 380 (1949); *Funk v. Buckley & Co.,* 158 Pa.Super. 586, 45 A.2d 918 (1946).

*Clear rules are needed for both candidates who must comply with them and their contributors.*

Accordingly, the Task Force recommends that the City codify the recent Board of Ethics Advisory Opinions requiring that campaign committees and inaugural and/or transition committees adhere to the contribution limits set forth in the campaign finance law with respect to their fundraising, regardless of their purposes (for example, debt retirement or inaugural events) even after a campaign concludes.

(R.R. 606a–07a (emphasis added).) The Firm contends that the 2010 amendments to the Philadelphia Campaign Finance Law followed this recommendation by the Task Force.

In response, the Ethics Board argues that the absence of an express reference to forgiveness of debt *post*-election in the Philadelphia Campaign Finance Law definition does not reflect an intent by the City to exclude such an act from the definition of "contribution." In support, the Ethics Board cites to the definition of "contribution" in the federal election law,[8] which also does not expressly mention *post*-election activities, but which federal courts have interpreted as applying to post-election contributions. In *United States v. Crop Growers Corporation,* 954 F.Supp. 335 (D.D.C.1997), a case cited by the Ethics Board, defendants sought to have certain charges dismissed in a criminal case arising out of an alleged scheme to make illegal campaign contributions. In particular, the defendants argued that post-election contributions made to a los-

ing candidate could not be construed as a violation of federal election law because in the absence of any allegation that the candidate intended to run again, such payments cannot be construed to influence the outcome of an election where the candidate has already lost. *Crop Growers,* 954 F.Supp. at 357.

Though acknowledging the "logical appeal" of the argument, the federal district court rejected it. First, the district court noted a history of Federal Election Commission (FEC) advisory opinions, interpreting the federal election law as applying to post-election contributions. *Id.* The district court held that such opinions were entitled to deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694, *reh'g denied,* 468 U.S. 1227, 105 S.Ct. 28, 82 L.Ed.2d 921 (1984). The district court then went on to emphasize two policy concerns supporting its decision:

> First, exempting post-election contributions ... would provide an opportunity for the exception to swallow the rule, as the Fifth Circuit has persuasively explained. *See* [*Fed. Election Comm'n v. Lance,* 617 F.2d 365, 372 n. 4 (5th Cir. 1980), *cert. denied,* 453 U.S. 917, 101 S.Ct. 3151, 69 L.Ed.2d 999 (1981) ] (exempting post-election contributions "would permit candidates to evade ... restrictions by running their campaigns at a deficit and then collecting contributions after the election"). Second, the Court can see no rational basis for basing [the federal election law]'s applicabil-

---

**8.** That definition provides, in relevant part:
The term "contribution" includes—
(i) any gift, subscription, loan, advance, or deposit of money or anything of value made by any person for the purpose of influencing any election for Federal office; or

(ii) the payment by any person of compensation for the personal services of another person which are rendered to a political committee without charge for any purpose.
2 U.S.C. § 431(8)(A).

ity on the success or failure of a candidate. Even if such a distinction were tenable, there is no way of knowing whether a losing candidate will bide her time, seek federal office at a more propitious point and, therefore, be subject to the improper influence [the federal election law] seeks to avoid. Defendants' suggestion that there be an exception for losing candidates who again seek office provides a host of enforcement problems. The Court is not willing to create a complicated regime of exceptions within exceptions that may require monitoring long after completion of a particular election.

*Crop Growers,* 954 F.Supp. at 358.

The Ethics Board argues that these very same policy concerns would arise if this Court were to side with the Firm on its interpretation of the Philadelphia Campaign Finance Law. As for the Task Force recommendation, the Ethics Board notes that the Task Force referenced favorably Ethics Board advisory opinions that interpreted the Philadelphia Campaign Finance Law as applying equally to pre- and post-election contributions. The Ethics Board argues that rather than reflecting a change of intent, the 2010 amendments reflect a desire to make more explicit the original intent that the law reach pre- and post-election contributions, as interpreted by the Ethics Board.

In support, the Ethics Board cites this Court's decision in *Kalins v. State Real Estate Commission,* 92 Pa.Cmwlth. 569, 500 A.2d 200 (1985). In *Kalins,* the Real Estate Commission fined petitioners $500.00 for selling time-share units in violation of the Real Estate Licensing and Registration Act (RELRA), Act of February 19, 1980, P.L. 15, *as amended,* 63 P.S. §§ 455.101–455.902. The petitioners argued, however, that at the time of the alleged unlawful activity, the RELRA defi-

nition of "real estate" did not expressly include time-share vacation units. The General Assembly, however, later amended the law to include expressly time-share interests. The petitioners argued that the later amendment to include time-share units in the definition of "real estate" evidenced the General Assembly's intent to omit time-share units from the original definition. We rejected that argument.

We first distinguished a line of precedent that embraced the premise that a legislative body's change of language in " 'a statute ordinarily indicates a change in legislative intent.' " *Kalins,* 500 A.2d at 202 (quoting *Masland v. Bachman,* 473 Pa. 280, 289, 374 A.2d 517, 521 (1977)). We noted that "ordinarily" is not the same as "always," holding that the applicability of the rule in *Masland* would depend on the nature of the legislative change. We analyzed the language changes in *Masland* and other cases that were cited in *Masland,* distinguishing them from the language change in *Kalins:*

> [I]n each of these cases the Legislature either changed the former language of the statute or adopted changed legislation on the subject matter, giving new and inconsistent substance to the old. Here, there was the single addition by name of a novel kind of interest in land come upon the market and requiring regulation.
>
> Moreover, the cases just described would be precedential in this case only upon the assumption that the definition of real estate in the [RELRA] before amendment did not already embrace time share interests by the phrases "interest in land" and "leasehold interests"; and that assumption would beg the question.

*Id.* at 203. Interpreting those phrases liberally to effect the object of the RELRA, 1 Pa.C.S. § 1928(c), we concluded that

the time-share vacation units were interests in land and leasehold interests and thus real estate, notwithstanding the subsequent amendment to the law to explicitly reference them in the definition of real estate. *Id.* at 203–04.

In resolving this question of statutory construction, as we did in *Kalins*, we must construe the definition of "contribution" in the Philadelphia Campaign Finance Law "liberally ... to effect [its] objects and to promote justice." 1 Pa.C.S. § 1928(c). On this point, the Pennsylvania Supreme Court observed: "In an effort to stem what has been characterized as a 'pay to play' political culture, the Philadelphia City Council enacted [the Philadelphia Campaign Finance Law] limiting campaign contributions to candidates for municipal office, and refined it by amendment in the years immediately thereafter." *Nutter*, 595 Pa. at 344, 938 A.2d at 403. This Court made a similar observation about the intent behind the campaign finance limits: "The purpose of the Ordinance is to change the political culture extant in elections for local office by eliminating large political contributions to current or potential public officials, which the City determined has the potential to undermine the integrity of the electoral process." *Nutter v. Dougherty*, 921 A.2d 44, 62 (Pa.Cmwlth.) (en banc), *aff'd*, 595 Pa. 340, 938 A.2d 401 (2007).

We reject the Firm's first contention—*i.e.*, that the City's decision to not enact the more fulsome definition of the term "contribution" found in the Election Code (Section 1621(b) of the Election Code, 25 P.S. § 3241(b)) evidences the City's intent to not regulate post-election debt forgiveness, which is expressly referenced in the Election Code definition. The Firm's argument might be persuasive if the City had chosen to adopt portions of the Elec-

tion Code definition of "contribution," but to omit the particular language referring to forgiveness of debt before and after an election.[9] Here, however, the definition of "contribution" in the Philadelphia Campaign Finance Law is so dissimilar to the Election Code definition that we cannot draw any conclusion as to what, if any, expressly stated portions of the Election Code's fulsome definition the City intended to exclude in its more concise, but not necessarily narrower, definition of the same term. The City unquestionably chose to define "contribution" in a more concise fashion, but we cannot conclude that the City's definition precludes inclusion of matters expressly set forth in the Election Code's definition for the sole reason that the City's definition is more concise.

■ We are also unpersuaded by the Firm's suggestion that the 2010 amendments to the Philadelphia Campaign Finance Law represented an *expansion* of the law to post-election activities, rather than clarification and codification of administrative interpretations of the pre-amendment law. We do not see the 2010 amendments, which added a separate definition for "post-candidacy contribution," as a recognition by the City that the pre-amendment definition of contribution did not already embrace the subject of the new defined term. To the contrary, the record relied upon by the Firm, specifically the Task Force report, provides that prior to the 2010 amendments the Ethics Board had interpreted the definition of "contribution" as extending to post-election activities in several advisory opinions. Although the Task Force recognized that post-election activities were not "expressly" referenced in the definition, neither did it take issue with the Ethics Board's inter-

**9.** *See supra* n. 5.

pretation of the definition as encompassing such activities. This is evidenced by the fact that rather than recommending an amendment to the Philadelphia Campaign Finance Law to reject the Ethics Board's interpretation—*i.e.,* to exclude from the definition of "contribution" post-election activities, the Task Force recommended amendments that would codify the Ethics Board's interpretation for purposes of clarity to candidates and their contributors.

Again, liberally construing the term to effect the purpose of the Philadelphia Campaign Finance Law, "contribution" is broad enough to embrace all contributions to candidates and their committees, whether pre- or post-election. As noted above, Section 20–1001(6) of the Philadelphia Campaign Finance Law defines "contribution" as follows: "Money, gifts, *forgiveness of debts,* loans, or things having a monetary value incurred or received by a candidate or his/her agent for use in advocating or influencing the election of the candidate." (Emphasis added.) The definition neither expressly limits its reach to pre-election activities nor prohibits its extension to post-election activities. Accordingly, it matters not whether the forgiveness of debt occurred before or after the election, so long as the purpose for which the Committee incurred the debt was to influence the outcome of the election of the candidate. The same policy concerns expressed by the district court in *Crop Growers,* discussed above, support our construction of the term "contribution" in this case.

The Firm's final argument is that the legal fee debt was not incurred to influence the outcome of the election; rather, it was incurred to secure Congressman Brady's right to be on the ballot in the 2007 Democratic mayoral primary. The Philadelphia Campaign Finance Law does not define the term "influence" or "influencing."

Where a term is not expressly defined in a statute, this Court will construe the term according to its common and approved usage. 1 Pa.C.S. § 1903(a). To do so, we may look to dictionary definitions. *Educ. Mgmt. Servs., Inc. v. Dep't of Educ.,* 931 A.2d 820, 825 (Pa.Cmwlth.2007). Merriam–Webster defines "influence," in part, as "to affect or alter by indirect or intangible means" or "to have an effect on the condition or development of." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY at 641 (11th ed. 2003).

Given this definition, legal fees incurred by a campaign committee to keep a candidate on the ballot are incurred for the purpose of influencing the outcome of an election. We applaud all of those who have the desire to serve in elected office and who are willing to step into the political arena. To argue that ballot challenge litigation is not part of that arena, however, invites the willful suspension of disbelief. As the trial court aptly observed, when faced with a legal challenge to a candidate's petitions or related filings, the candidate's campaign committee may incur legal fees to defend the candidate for the purpose of keeping the candidate on the ballot. (R.R. at 893a.) A candidate's placement on or removal from the ballot certainly influences the outcome of the election, as it directly impacts the choices voters will have when they cast their votes on Election Day. (*Id.* at 892a–93a.) Contrary to the position of the Firm, the determination of whether a candidate will remain on the ballot has more than "some incidental effect" on the outcome of an election.

In summary, and based on the foregoing analysis, should the Firm choose to forgive all or any portion of the $448,468.09 debt owed by the Committee, the forgiveness would be a contribution for purposes of the Philadelphia Campaign Finance Law be-

cause: (1) forgiveness of debt is expressly included in the definition of "contribution;" (2) the definition is not limited to only pre-election forgiveness of debt; and (3) the legal fee debt was incurred pre-election for the purpose of giving voters the opportunity to vote for Congressman Brady in the 2007 Democratic mayoral primary (*i.e.*, to influence the outcome of the election).

Accordingly, we affirm the orders of the trial court.

## ORDER

AND NOW, this 18th day of June, 2013, the orders of the Court of Common Pleas of Philadelphia County, dated July 18, 2012, are hereby AFFIRMED.